**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
| Plaintiff, ) | |
| ) | No. CR 17-1904-TUC-CKJ (LCK) |
| vs. ) | |
| ) | **ORDER** |
| Edgar Antonio Casahonda, et al., ) | |
| Defendants. ) | |

Pending before the Court is the Motion RE: Independent Source Evidence (Doc. 467) filed by the government. A response (Docs. 471, 475) and a reply (Doc. 476) have been filed. Evidence and oral argument were presented to the Court on September 7, 2021, and October 5, 2021. The Court took the matter under advisement.

I. *Procedural History*

On March 17, 2021, Magistrate Judge Lynnette C. Kimmins issued a Report and Recommendation ("R&R") (Doc. 430) in which she found the Motion to Dismiss (Doc. 230) filed by Defendant Edgar Antonio Casahonda ("Casahonda"), to which Defendants Jesus De la Cruz Moreno (Moreno), Jose Rodriguez San Miguel, III ("San Miguel"), Francisco Fabian Alexis Romero ("Romero"), Martin Flores ("Flores"), Cesar Ernesto Lorea Rubio ("Lorea Rubio"), and Antonio Adrian Nieto-Macias ("Nieto-Macias") joined, had failed to make a prima facie case of an equal protection violation. Further, Magistrate Judge Kimmins found that the arrest of Defendants Casahonda, Moreno, and San Miguel, and the seizure of Casahonda's currency, violated their Fourth Amendment rights against unlawful seizure. Additionally, the magistrate judge found the search of San Miguel, the second search of the

vehicle, Casahonda's July 27, 2017, statement, San Miguel's July 27, 2017, and August 2, 2017, statements, Moreno's July 27, 2017, and August 16, 2017, statements, and the ATF Form 4473s obtained from Ammo AZ and R&A Tactical in August 2017 were all fruit of the illegal arrests and seizures.

Therefore, Magistrate Judge Kimmins recommended that all evidence obtained on July 27, 2017, or during ATF's investigation as a direct result of the unlawful arrests and seizures that day, be suppressed as to the Defendants whose rights were violated. She further recommended the Motion to Suppress (Doc. 125) by Defendants Casahonda, Moreno, and San Miguel as to the specific identified evidence be granted, but the Motion to Suppress be denied as to the remaining Defendants. The Court adopted the recommendation.

On July 28, 2021, the government filed a Motion RE: Independent Source Evidence (Doc. 467). The government will not seek to admit specified evidence, *see* Motion (Doc. 467, p. 3), but seeks to admit evidence for which it asserts it has an independent source. A response (Docs. 471, 475) and a reply (Doc. 476) have been filed. Evidence and oral argument were presented to the Court on September 7, 2021, and October 5, 2021.

II. *Testimony of Chad Sutterley*

Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent Chad Sutterley ("Sutterley") testified during the hearings on this issue. While he is currently a detective with the ATF, he was formerly employed as a police officer with the Tucson Police Department ("TPD") for approximately ten years; during his time as a Tucson police officer, he spent approximately four years as a patrol officer.

In contacts with members of the public during a criminal interdiction traffic stop, it was a typical law enforcement practice to try to identify both the driver and any passengers or an investigation of suspected criminal activity.[1] This was important for officer safety and

---

[1] A criminal interdiction would occur when a traffic stop is being conducted for reasons other than a traffic violation or where suspicion of other criminal activity arises

because learning of associations can later be helpful even if they are not used at the time or if an arrest was not made. Attempts to identify passengers were made if, during a traffic stop, a suspicion of criminal activity was raised even if nothing of evidentiary value is observed to support that suspicion.

With both the TPD and ATF, Sutterley has participated in multiple investigations. He is familiar with common law enforcement practices.

Sutterley first became aware of information related to Defendants in this case when a bulk ammunition order involving approximately 300,000 rounds was brought to his attention in February 2016 by a company in Prescott, Arizona, called J&G Sales. Casahonda and Lorea Rubio were identified as associated with these purchases and each other. Although Sutterley did not contact either Casahonda or Lorea Rubio at that time, he contacted other persons related to the matter in his investigation. That investigation remained open.

In July of 2017, suspicious activity, including a suspicious purchase had been observed at Sportsman's Warehouses involving Lorea Rubio and another man, was reported to ATF. Lorea Rubio was identified from an ATF Form 4473. During the purchase, individuals from a separate white Chevy Impala walked back and forth in the store, but did not look at anything or have contact with Lorea Rubio; they then left the store. After the purchase was completed, Lorea Rubio's vehicle and the vehicle containing the two individuals who had walked back and forth left the lot in tandem. The vehicle in which the other two individuals left was registered to Nieto-Macias.

Those two individuals, who were subsequently identified as Casahonda and San Miguel, returned the next day and attempted to purchase the same firearm that Lorea Rubio had purchased the previous day.[2] The loss prevention unit of the store observed this and

---

during the traffic stop.

[2]Employees of the Sportsman's Warehouse recognized San Miguel as one of the two individuals from the Impala the day before.

thought it was unusual; they cancelled the sale and refused to sale the firearm to San Miguel. The loss prevention unit contacted their other stores, informing them they believed San Miguel had been attempting to make a straw purchase.  San Miguel attempted to purchase the firearm at another store; store employees filled out ATF Form 4473 and refused to sell the firearm.  Store employees reported these incidents to the ATF Phoenix field office. Information regarding these incidents were referred to Sutterley in August, 2017; one of the reasons they were referred to him was because they involved Casahonda.   Sutterley had previously known Casahonda and was able to identify him through a driver's license photo and San Miguel was identified from an ATF Form 4473. Sutterley testified he would have followed up on the referral even if he did not have the 2016 investigation involving Casahonda.

Sutterley testified that if he had only known of the two July 2017 Sportman's Warehouse incidents,  Sutterley would have reached out to different federal firearms license holders ("FFLs") as part of his investigation.  Through his experience, Sutterley has learned these FFLs have high volume sales and are cooperative with ATF.[3]  Specifically, Sutterley would have contacted R&A Tactical, Second Amendment Sports and SNG Tactical. Additionally, Sutterley would have known of Lorea Rubio from an ATF Form 4473, San Miguel from two ATF Form 4473s, and Nieto-Macias from the license plate checks of the vehicles at the Sportman's Warehouse incidents.   Sutterley had previously known Casahonda; he had a copy of Casahonda's Arizona driver's license photo from a previous investigation.  Sutterley was able to identify him from the Sportman's Warehouse video. Additionally, an R & A Tactical employee advised Sutterley he believed Flores may be involved in the suspicious purchases by San Miguel.

On July 27, 2017, an Arizona Department of Public Safety ("DPS") officer conducted a traffic stop on a white Chevy Impala.  The vehicle was registered to Nieto Macias and was

---

[3]Sutterley investigates referrals that require contact with FFLs on an almost weekly basis.

- 4 -

driven by Casahonda. Casahonda and the passengers were subsequently arrested. The passengers, Moreno and San Miguel, were not identified until after they were arrested.

Without any knowledge of the July 27, 2017, traffic stop involving Casahonda, Moreno and San Miguel, his investigation from the Sportsman's Warehouse incidents would have led Sutterley to attempt to interview Lorea Rubio and San Miguel; depending on the investigation, Sutterley may have attempted to interview Casahonda. However, Casahonda was contacted by other ATF agents regarding a separate investigation and was not cooperative.[4]

Sutterley learned of the July 27, 2017, traffic stop involving Casahonda, Moreno and San Miguel. The traffic stop of Casahonda alone would have been of interest to him. However, neither he nor anyone else from ATF participated in the interviews or investigation that occurred on July 27, 2017.

On August 2, 2017, after Sutterley learned of the traffic stop, but before he learned of the Sportsman's Warehouse incidents, he interviewed San Miguel. Sutterley wanted to discuss the purchases reflected in records regarding the purchase of firearms.[5] In response to an open-ended question, San Miguel stated he had been stopped on a traffic stop with his friend Edgar and provided Sutterley with two bills of sale for firearms that were not associated to the receipts seized on July 27, 2021, by DPS. San Miguel was the first person to bring up the traffic stop. Sutterley would have attempted to ascertain as much information about the traffic stop had he not known about it; such information may provide association

---

[4]On September 12, 2017, while conducting surveillance in the separate investigation, Casahonda and Romero were observed in Nieto-Macias' vehicle; they completed a straw purchase. This was the first time Casahonda and Romero were associated with each other. Additionally, the vehicle used during this incident was the same vehicle observed at the Sportsman's Warehouse in July 2017. In other words, in September 2017, Nieto-Macias' vehicle would have separately been part of an ATF investigation. Additionally, Sutterley was able to photographically identify Casahonda, San Miguel, and Lorea Rubio from the surveillance.

[5]Sutterley received ATF Form 4473s and/or records regarding the purchase of firearms by San Miguel from Ammo AZ and R & A Tactical.

1  information that may later be important.

2  Sutterley asked San Miguel about people he worked with in the purchasing of firearms
3  and about purchases and sales. Sutterley did not ask San Miguel about statements made to
4  DPS during interviews following the traffic stop. Had Sutterley not known of the traffic
5  stop, he would have followed up on the traffic stop after receiving the information from San
6  Miguel.

7  San Miguel identified Casahonda, Nieto-Macias, Moreno, and Flores as participants
8  in illegal firearms purchases during the interview. San Miguel identified Nieto-Macias from
9  a photograph based on information learned from the traffic stop. Sutterley knew of Flores
10 from the receipts obtained through the traffic stop. Sutterley also knew of Casahonda and
11 Nieto-Macias from the referral based on the traffic stop. However, he testified he would
12 have wanted to interview San Miguel after learning of the Sportsman's Warehouse incidents
13 and he would have asked similar questions. The implication is that San Miguel would have
14 identified Nieto-Macias and Flores at such a later independently-sourced interview. In such
15 an interview, Sutterley would have virtually had the same information, but with different
16 firearms. Because San Miguel was so cooperative he believes San Miguel would have told
17 him the same information. Further, the Sportsman's Warehouse incidents alone would have
18 made Casahonda known to Sutterley. Generally, Sutterley learned through his own
19 investigation that Casahonda had not himself completed ATF Form 4473s, but recruited other
20 individuals to do so.

21 On August 15, 2017, Sutterley received information from the Crime Gun Intelligence
22 Center ("CGIC") that Lorea Rubio had purchased a Colt M4 carbine. A surveillance video
23 indicated Lorea Rubio was a passenger in a Dodge Charger with a Chevy Impala parked near
24 the Charger. The video showed two men entering a Sportsman's Warehouse on July 15,
25 2017, around the same time as Lorea Rubio. Sutterley identified San Miguel from an ATF
26 Form 4473 and a driver's license photo. Sutterley identified Casahonda with a driver's
27 license photo.

28

The Chevy Impala was registered to Nieto-Macias. The defense asserts that the vehicle would not have been in the applicable database if not for the traffic stop. However, on September 8, 2017, in a separate ATF investigation, the same Chevy Impala was seen at an R&A Tactical as associated with that separate investigation; two males were observed loading four firearms in the vehicle. After the vehicle was stopped, Casahonda was identified as the driver. Sutterley testified the other agents would have likely entered the information into the database. Although the defense implies the stop would not have been made if not for the prior entries into the database, the government indicates the vehicle was stopped for investigation of firearms trafficking; in addition to observing the loading of the four firearms, information from the Sportsman's Warehouse incidents were then available to the agents. Moreover, under a firm ATF policy, four firearms being loaded into a vehicle would warrant a trafficking investigation.

On August 16, 2017, Sutterley interviewed Moreno. At that time, the only information regarding Moreno was from the traffic stop. During the interview, Sutterley showed Moreno an AFT Form 4473; the basis for this form was the traffic stop.

On September 27, 2017, Sutterley interviewed Flores. Sutterley knew of the purchase of an AK-47 type of rifle that Flores was involved in from an ATF Form 4473 from Second Amendment Sports. This firearm was not involved in the traffic stop or the subject of the receipts obtained on July 27, 2017. After Sutterley showed Flores the ATF Form 4473, Flores told Sutterley he had also purchased another firearm; Flores had last seen this firearm in the trunk of a white car driven by Casahonda. Sutterley did not confront Flores with statements from other suspects or information from the traffic stop.

Additionally, Sutterley showed Flores photographs of Casahonda, Nieto Macias, and Moreno; Flores identified those individuals and their involvement with the purchases. This included an attempted purchase involving Flores and Moreno. Had Sutterley not know of Moreno prior to his interview with Flores, he would have attempted to interview Moreno following his interview with Flores.

III. *Independent Source Doctrine*

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Yang*, 958 F.3d 851, 858 (9th Cir. 2020). In general, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009), *quoting Katz v. United States*, 389 U.S. 347, 357 (1967)).

The exclusionary rule "often requires trial courts to exclude unlawfully seized evidence in a criminal trial." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Id.*, *internal quotation marks omitted*. However, the Supreme Court has stated, "the significant costs of this rule have led us to deem it applicable only. . . where its deterrence benefits outweigh its substantial social costs." *Id.*, *citation and internal quotation marks omitted*. The Supreme Court has thus carved out certain exceptions to the exclusionary rule because "[s]uppression of evidence . . . has always been our last resort, not our first impulse." *Id.*, *citation omitted*.

One of these exceptions is the independent source doctrine, which involves "the causal relationship between the unconstitutional act and the discovery of evidence." *Id.* "[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Id.*, *citing Murray v. United States*, 487 U.S. 533, 537 (1988)). The government must establish by a preponderance of evidence there is an independent source of the evidence.

Case 4:17-cr-01904-CKJ-LCK   Document 529   Filed 11/03/21   Page 9 of 12

*United States v. Cales*, 493 F.2d 1215, 1216 (9th Cir. 1974).

Justice Marshall has stated:

> The clearest case for the application of the independent source exception is when a wholly separate line of investigation, shielded from information gathered in an illegal search, turns up the same evidence through a separate, lawful search. Under these circumstances, there is little doubt that the lawful search was not connected to the constitutional violation. The exclusion of such evidence would not significantly add to the deterrence facing the law enforcement officers conducting the illegal search, because they would have little reason to anticipate the separate investigation leading to the same evidence.

*Murray v. United States*, 487 U.S. 533, 545 n. 1 (1988) (Marshall, J., dissenting). Generally speaking, it is clear there was a separate investigation here. However, the Court will address specific evidence and whether its discovery could have resulted from an independent source.

A. *August 2, 2017, Statement of San Miguel*

The investigation of the Sportsman's Warehouse incidents would have resulted in Sutterley interviewing San Miguel. *See United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1165 (9th Cir. 2008) ("information was learned from preexisting, unrelated investigations"); *United States v. Fisher*, 700 F.2d 780, 784 (2d Cir.1983) (routine referral following arrest of defendant on an unrelated matter provided independent source). However, the defense argues that San Miguel's unconstitutional arrest and ensuing knowledge that he was already a suspect in a straw purchase investigation irreversibly altered the calculus of his circumstances and predisposed him to make self-inculpatory statements during any post-arrest interview the agent. The defense has not provided any authority to support this argument. Rather, the Court finds this argument is speculative. Both at the time of the interview that did occur and at a time when a potential interview would have occurred, San Miguel was/would have been aware that he had participated in suspicious activities. It is reasonable to conclude he would have made similar statements during each interview. With the exception of statements regarding the firearm purchase from Ammo AZ and the identification of Moreno, as discussed *infra*, the Court finds the government has met its preponderance of the evidence standard as to San Miguel's statement.

- 9 -

B. *August 16, 2017, Statement of Moreno*

The identification of Moreno in the interview of San Miguel was part of the reason leading to the interview of Moreno. Although Sutterley testified that law enforcement officer attempt to identify passengers, that was not done in this case. Rather, the evidence presented indicates the passengers were not identified until after they had been arrested. The arrests would not have occurred if not for the unconstitutional conduct. Further, it is not clear from the testimony how San Miguel identified Moreno. It appears Sutterley showed photographs of possible associates to San Miguel and that the availability of the photographs resulted from the traffic stop.[6] Moreover, no testimony was presented that San Miguel spontaneously named Moreno (i.e., without reference to a photograph).

Moreover, although Sutterley became aware of Moreno making one of his unlawful firearm purchases from Sportsman's Warehouse in Tucson on July 18, 2017, only two days after San Miguel's suspicious attempted purchase, the government has not shown how, without the identification from San Miguel, the government would have been led to believe Moreno's purchase was suspicious. In such circumstances, the Court finds the government has not met its burden to show there is an independent source of evidence as to the identification of Moreno. Evidence adduced from Moreno's interview is tainted by the unconstitutional conduct and may not be used at trial.

C. *ATF Form 4473*

It was the normal practice that referrals such that occurred in this case would be investigated by ATF. Moreover, the business which provided the ATF Form 4473, R&A Tactical, was one the agent routinely contacted in his investigations. The Court finds the ATF Form 4473 obtained from R & A Tactical in August 2017 was obtained through the independent separate investigation; the government has met its burden of proof as to the

---

[6]The defense response indicates driver's license photographs were used for the identifications.

- 10 -

independent source of this evidence.

D. *Additional Defense Arguments*

The defense argues that the identifications of Casahonda and San Miguel as being present during a firearm transaction at Sportsman's Warehouse on July 15, 2017, are the fruits of their illegal arrest on July 27, 2017. However, Casahonda had been identified through the February 2016 Prescott J & G Sales referral. Although Sutterley did not contact Casahonda or Lorea Rubio following the referral, other individuals were contacted and the case remained open at the time of the traffic stop. Because Sutterley had previously known of Casahonda, and was able to identify him through a driver's license photo following the Sportsman's Warehouse incidents, the identification of Casahonda was not contingent on the traffic stop. Moreover, San Miguel was identified from an ATF Form 4473 from the Sportsman's Warehouse incidents; similarly, his identification was not based on the traffic stop. Indeed, Sutterley testified he would have followed up on the Sportsman's Warehouse incidents even if he did not have the 2016 investigation involving Casahonda. The Court finds there is an independent source for this evidence.

The defense also argues that the traffic stop of Casahonda on September 12, 2017, was directly the result of his arrest on July 27, 2017. Although the defense implies the stop would not have been made if not for the prior entries into the database, the government asserts the vehicle was stopped for investigation of firearms trafficking; in addition to observing the loading of the four firearms, information from the Sportsman's Warehouse incidents was then available to the agents. Moreover, under a firm ATF policy, four firearms being loaded into a vehicle would warrant a trafficking investigation. The Court finds there is an independent source for this evidence.

The defense has also argued that the identification of passenger San Miguel during the traffic stop would not have been made if not for the unconstitutional conduct. This argument does not assist the defense as San Miguel was also identified through the

1  Sportsman's Warehouse incidents.

2          Additionally, San Miguel identified Flores as a person involved with the purchase of
3  firearms. Although Sutterley knew of Flores from the receipts obtained through the traffic
4  stop, the independent source of San Miguel's statement provides the basis for further
5  investigation of Flores. However, it is not clear from the testimony how San Miguel
6  identified Flores.[7] It appears Sutterley showed photographs of possible associates to San
7  Miguel and that the availability of the photographs is from the traffic stop. Moreover, no
8  testimony was presented that San Miguel spontaneously named Flores (i.e., without reference
9  to a photograph). Nonetheless, even if San Miguel had not identified Flores from the tainted
10  photograph, Sutterley's subsequent investigation would have. Specifically, when Sutterley
11  was obtaining ATF Form 4473s regarding San Miguel from R & Tactical, an employee
12  advised Sutterley that Flores may have been involved with the suspicious purchases. The
13  Court finds there is an independent source for this evidence.

14          Accordingly, IT IS ORDERED:

15          1.      The government's Motion RE: Independent Source of Evidence (Doc. 467)
16  is GRANTED IN PART AND DENIED IN PART.

17          2.      Moreno's statement and evidence adduced from Moreno's August 16, 2017,
18  interview is tainted and may not be used at trial.

19          DATED this 3rd day of November, 2021.

_____
Cindy K. Jorgenson
United States District Judge

---

[7] The defense response indicates driver's license photographs were used for the identifications.